**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, et al., Plaintiffs,**

v.

**HELLENIC LINES LIMITED, et al., Defendants.**

**No. 83 Civ. 8560 (RWS).**

United States District Court,. S.D. New York.

Feb. 23, 1984.

Lord Day & Lord, New York City, for plaintiff Morgan Guar. Trust Co. of New York; John J. Loflin, Jerry E. Muntz, New York City, of counsel.

Nourse & Bowles, New York City, for plaintiff Intern. Terminal Operating Co., Inc.; John E. Bradley, David A. Nourse, New York City, of counsel.

Ober, Kaler, Grimes & Shriver, New York City, for plaintiffs CTI–Container Leasing Corp. and Transamerica ICS, Inc.; Kieron F. Quinn, John T. Ward, New York City, of counsel.

Poles, Tublin, Patestides & Stratakis, New York City, for defendant Hellenic Lines Ltd.; John G. Poles, Alan Van Praag, Peter P. McNamara, New York City, of counsel.

## OPINION

SWEET, District Judge.

Two motions are before this court, both of which seek to establish the validity and priority of maritime liens asserted against certain Hellenic Lines Limited ("Hellenic") vessels and their freights.[1] A number of admiralty *in rem* proceedings, including several now consolidated before this court,[2] were pending when Hellenic filed a voluntary petition for Chapter 11 reorganization under the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* Prior to the filing of Hellenic's petition, maritime lien claimants had arrested four Hellenic vessels in this jurisdiction, and at least one maritime lien claimant had arrested the freights, subfreights and charter-hire of these and other Hellenic vessels. Certain maritime lien claimants now seek a determination that this court retains exclusive jurisdiction over the arrested vessels and freights, despite Hellenic's Chapter 11 petition, thus squarely presenting the jurisdictional and procedural conflicts between this court, sitting in admiralty, and the Bankruptcy Court. For the reasons set forth below, the motion of CTI Container Leasing Corporation ("CTI") and Transamerica .ICS, Inc. ("ICS") will be granted and that of International Terminal Operating Co., Inc., ITO Corporation of Virginia, ITO Corporation of Baltimore, ITO Corporation, and Atlantic & Gulf Stevedores, Inc. (collectively "ITO") will be granted in part and denied in part.

**Prior Proceedings**

CTI and ICS commenced actions on November 28, 1983 against Hellenic *in personam* and the MV HELLENIC INNOVATOR and her freights *in rem*, and on December 9, 1983 against the MV HELLENIC SPIRIT and her freights *in rem* to enforce maritime liens arising out of various leases of marine cargo containers and related marine equipment. CTI and ICS assert that the leases are maritime contracts, *see CTI-Container Leasing Corp. v. Oceanic Operators*, 682 F.2d 377, 380 (2d Cir.1982), and that the containers provided to the vessels are "necessaries" and therefore give rise to maritime liens under 46 U.S.C. § 971, *Nautilus Leasing Services, Inc. v. MV COSMOS*, 1983 AMC 1483 (S.D.N.Y. March 22, 1983). CTI seeks to recover

---

1. "Freight" is the compensation the shipowner is to receive for the carriage of goods. Gilmore & Black, *supra*, at 245.

2. The following actions have been consolidated:
 Morgan Guaranty Trust Co. of New York v. Hellenic Lines Limited, et al.—83 Civ. 8560
 CTI—Container Leasing Corporation v. M/V HELLENIC INNOVATOR—83 Civ. 8586
 International Terminal Operating Co., Inc. v. Hellenic Lines Limited, et al—83 Civ. 8608
 Flexi-Van Leasing Inc. v. Hellenic Lines Limited et al—83 Civ. 8760

 SeaCo Inc. v. M/V HELLENIC INNOVATOR, et al—83 Civ. 8761
 SeaCo Inc. v. M/V HELLENIC SPIRIT—83 Civ. 8966
 CTI—Container Leasing Corporation v. M/V HELLENIC SPIRIT—83 Civ. 8968
 Transamerica ICS, Inc. v. M/V HELLENIC SPIRIT—83 Civ. 8969
 Morgan Guaranty Trust Company of New York et ano v. Hellenic Lines Limited—83 Civ. 8974
 In addition, numerous maritime lien claimants have intervened in one or more of these actions.

more than $2,078,000 in rent and other charges due under the leases or the value of the equipment, reputedly $9,000,000. Similarly, ICS seeks to recover $459,000 under its leases or $1,646,000 as the value of the unreturned equipment. By this motion they seek an order declaring that this court has exclusive jurisdiction over the vessels and their freights.

ITO commenced an action, 83 Civ. 8608, on November 29, 1983, against Hellenic *in personam* and twenty Hellenic vessels *in rem*. Pursuant to 46 U.S.C. § 971, ITO claims a maritime lien for stevedoring services and other necessaries provided to the vessels for or on behalf of Hellenic. On November 29, 1983, ITO obtained Warrants For Arrest *in rem* against the MV HELLENIC STAR ("STAR") and the MV HELLENIC INNOVATOR ("INNOVATOR"). Morgan Guaranty Trust Company of New York ("Morgan Guaranty") and other maritime lien claimants arrested a third vessel, the MV HELLENIC IDEAL ("IDEAL"), at roughly the same time. On December 12, 1983, ITO and other maritime lien claimants obtained Warrants For Arrest *in rem* against the MV HELLENIC SPIRIT ("SPIRIT").

On December 8, 1983, ITO obtained Warrants For Arrest *in rem* against the freights, sub-freights and charter-hire of eighteen vessels named in its Amended Verified Complaint.[3] The Clerk of the Court issued a summons to show cause why intangible property should not be paid into court to each of the following: Morgan Guaranty, Hellenic American Agencies, Inc. ("Hellenic American") and Continental Bank International ("Continental"), and to all persons having control of the freights, sub-freights, and charter-hire of the MV HELLENIC CHALLENGER, MV HELLENIC CHAMPION, MV HELLENIC PRINCE, MV HELLENIC EXPLORER, MV HELLENIC SKY, MV HELLENIC GRACE, MV HELLENIC PATRIOT, MV HELLENIC PIONEER, MV GRIGORIS C.

I.V., MV HELLENIC PRIDE, MV HELLENIC SEAMAN, MV HELLENIC SUN, MV HELLENIC VALOR and MV HELLENIC WAVE and the STAR, INNOVATOR, IDEAL and SPIRIT. Morgan Guaranty filed a Verified Answer of Garnishee indicating that it has custody and control of $99,880.94 in freight monies earned by ten of the eighteen vessels whose freights were subject to ITO's arrest. Neither Hellenic American nor Continental filed a garnishee's answer, but Continental informed ITO that it holds no such freight monies.

On December 12, 1983, Hellenic and Hellenic American filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.*, in the Southern District of New York. On December 28, 1983, Hellenic moved, by order to show cause, in the Bankruptcy Court, for permission to use $420,000 in freight revenue located in New York to cover operating expenses through mid-January 1984. At a hearing on January 4, 1984, over the objections of ITO and other maritime lien claimants, Bankruptcy Judge Burton R. Lifland granted Hellenic's motion, allowing it to use the $420,000 in freight monies and requiring it to grant Morgan Guaranty, ITO and other lien claimants a first lien and security interest upon Hellenic's leasehold interest in its premises at 39 Broadway, New York, New York and upon the proceeds of the sale of the MV HELLENIC CONCORDE, owned by Transpacific Carrier Corporation, after payment of all valid and perfected prior liens, as substituted collateral.

In an order filed January 4, 1984, Judge Lifland vacated the automatic stay of Section 362 of the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code"), 11 U.S.C. § 362, "to the extent of permitting CTI to intervene or participate in any action, existing or future, against any assets, including vessels, of Hellenic wherever they might be found...." Acknowledging that courts of

---

**3.** An admiralty action *in rem* may be maintained against freights and subfreights. *United States v. Freights, etc., of S.S. Mount Shasta,* 274 U.S. 466, [47 S.Ct. 666, 71 L.Ed. 1156] (1927). A lien against the vessel extends to accrued or earned freights that have not been paid or turned over to the vessel owner before the attachment. *See* Development in the Law of Maritime Liens, 45 Tul.L.Rev. 575, 575 n. 2 (1971).

admiralty outside the United States may not recognize the jurisdiction of United States Bankruptcy Courts with respect to the disposition of vessels free and clear of maritime liens and in an effort to maximize the proceeds from the sale of the vessels arrested in this and other actions, Judge Lifland, in an order filed January 20, 1984, further vacated the automatic stay and permitted any party having a claim against fourteen Hellenic vessels, including the INNOVATOR, the STAR, the IDEAL, and the SPIRIT, the vessels arrested in this action, to "take any and all steps necessary to protect and enforce their rights and interests in the aforementioned Vessels, including the commencement and prosecution of Admiralty Proceedings in courts of competent jurisdiction, sale of the aforementioned Vessels and the distribution of the proceeds of such sales."

On February 3, 1984, this court ordered the interlocutory sale of the ships arrested here, the STAR, IDEAL, SPIRIT and INNOVATOR, on March 2, 6, 13 and 16, respectively, subject to confirmation by the court.

On February 6, 1984, Hellenic again sought permission of the Bankruptcy Court to use freight revenue to cover operating expenses, this time seeking to use up to $700,000 for the period of February through April, 1984. Judge Lifland declined to sign Hellenic's order to show cause which was then submitted to this court. It was withdrawn by Hellenic before the return date on the understanding that Judge Lifland would permit Hellenic to redraft the application to include additional information and would then entertain the application. The renewed order to show cause has not yet been filed in either court.

### I. The Disposition of the Motion by CTI and ICS

CTI and ICS seek an order declaring that this court retains exclusive jurisdiction over the INNOVATOR and the SPIRIT and their freights. CTI and ICS contend that their pre-petition *in rem* actions involve matters lying within the exclusive admiralty and maritime jurisdiction of this court,

U.S. Const. Art. III § 2 and 28 U.S.C. § 1333, and therefore the vessels and their freights do not come within the control of the Bankruptcy Court as assets to be administered in the bankruptcy proceeding.

As noted above, the Bankruptcy Court has lifted the automatic stay of Section 362 of the Bankruptcy Code to permit the prosecution of admiralty proceedings in courts of competent jurisdiction against fourteen Hellenic vessels, including the INNOVATOR and the STAR. To the extent, if any, the automatic stay applied to the pending *in rem* actions by CTI and ICS against these vessels, it is no longer a bar. As a result, there is no jurisdictional clash between this court, sitting as a court in admiralty, and the Bankruptcy Court, with respect to the sale of these vessels.

The INNOVATOR and SPIRIT are scheduled to be sold on March 16 and March 13, 1984, respectively, subject to confirmation by this court. When the INNOVATOR and SPIRIT are sold, the maritime liens will be extinguished as against these vessels in the hands of the purchasers. *See* G. Gilmore & C. Black, *The Law of Admiralty* § 9–85, at 787 (2d ed. 1975). A judicial sale of vessels by an admiralty court acting *in rem* divests not only all liens held by claimants who intervened in or had notice of the proceeding but all liens everywhere. *Id.* Upon the sale of a vessel, the liens attach to the proceeds of the sale, and the court will distribute the proceeds to maritime lien claimants in accordance with their respective priorities. *Id.* at 788. While the personal liability of any person subject to claims by these maritime lienors is not absolved through the execution of the maritime liens, the lienors' right to proceed against the ship is lost forever.

In admiralty, freights are considered incident to the vessel, *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515, 521 (2d Cir.1979); *Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 192 (9th Cir.1962), at least until the ship "turns over" the surplus of freights to the owner, *Galban Lobo Trading Co. v. The Diponegaro*, 103 F.Supp.

452, 454 (S.D.N.Y.1951); *Loizos v. Compania Naviera Limitada*, 94 F.Supp. 111, 112–13 (E.D.Pa.1950).[4] Although Judge Lifland's order filed January 20, 1984 does not explicitly cover the vessels' freights, it does so by operation of law because a vessel and her freights are one. Disposition of the vessels and execution of the maritime liens against the vessels but not their freights outstanding at the time of arrest could raise questions as to the clean title of the vessels after sale. To prevent any cloud upon the title of the INNOVATOR, and the SPIRIT, I conclude that this court, sitting as a court in admiralty, should administer the freights incident to these vessels and distribute them to the maritime lien claimants with the proceeds from the sale of the vessels. Because of my interpretation of the implications of Judge Lifland's order vacating his stay, I conclude that the motions of CTI and ICS have not presented any conflict of jurisdiction or procedure. This court retains exclusive jurisdiction over the vessels and their freights.

Further, in the event that my interpretation of Judge Lifland's order were in error, the disposition of the CTI and ICS motions would remain unchanged in light of the following discussion. The difference in result from that which has been accorded to the major portion of the motion of ITO stems from the distinctions between the purposes of the two courts and the character of the res seized by ITO and that seized by CTI and ICS.

## II. The Disposition of the Motion by ITO

■ ITO, like ICS and CTI, contends that this court, sitting as a court in admiralty, possesses exclusive jurisdiction over the freights seized by ITO for the purpose of adjudicating competing claims against the freights. The freights seized by ITO include those of the INNOVATOR, STAR, IDEAL, and the SPIRIT, vessels properly within the jurisdiction of this court as a result of their pre-petition arrest and the subsequent vacatur of the automatic stay to the extent, if any, it applied to these vessels. As to those freights, this court has exclusive jurisdiction for the reasons stated with respect to the motion of CTI and ICS. I therefore direct Hellenic pursuant to ITO's motion to provide an accurate voyage accounting of the STAR, IDEAL, INNOVATOR and SPIRIT, and to deposit the freight revenue collected since the respective date of arrest of each vessel into the registry of the court. These monies will be distributed to the maritime lien claimants with the proceeds from the sale of the vessels. At this time, the court need not determine whether there will be funds available to be distributed to nonlien claimants. *See Bender Welding & Mach. Co. v. MV Sovereign Opal*, 415 F.Supp. 772, 775 n. 9 (S.D.Ala.1976).

With respect to the freights of other vessels, the motion by ITO squarely raises the jurisdictional issue skirted by the CTI and ICS motion. Judge Lifland's order filed January 20, 1984 lifted the automatic stay, with the consent of the parties, to permit the sale of the arrested vessels. The order, however, does not apply to ITO's pending *in rem* action against freights, subfreights and charter hire of Hellenic vessels which have not been arrested in this jurisdiction. Hellenic contends that the Bankruptcy Court has assumed jurisdiction over all property of Hellenic, including these freights, thus raising the issue of which court—bankruptcy or admiralty—has jurisdiction over the freights. For the reasons set forth below, I conclude that these freights are appropriately administered in the Bankruptcy Court and deny ITO's motion.

---

**4.** As the court noted in *Loizos, supra,* at 112–13:

Logic demands that where freights are earned by a vessel, and where no question of fraud is involved, they at some time be considered as personal property of the owner not subject to a maritime lien or an attachment in a proceeding in rem. In other words, there must at some point be a separation of the freights from the personage of the ship. To me, that time would be at the end of each voyage when the ship "turns over" the surplus of freights to the owner. They are then personal property subject to the control of the owner.

The issues raised by the ITO motion will be considered in the following order: (1) the jurisdictional conflict, (2) the effect of *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598, (3) the power of the bankruptcy court to adjudicate the validity and priority of maritime liens, (4) the doctrine of custodia legis, and (5) the competing policies of admiralty and bankruptcy. Of course, the essential inquiry is whether the reorganization proceeding of Hellenic should take precedence over the pending *in rem* admiralty proceedings in this court.

### 1. The jurisdictional conflict

The freights were properly brought within the jurisdiction of this court prior to the commencement of Hellenic's bankruptcy proceeding. However, the bankruptcy estate to be administered by the Bankruptcy Court includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Thus the freights appear to be properly within the jurisdiction of both courts. Reconciliation of this jurisdictional dispute is further complicated by the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which invalidated the broad grant of jurisdiction given to the Bankruptcy Courts. Further, of course, there is a conflict between the *in rem* arrest procedures in admiralty, *see* Rule C(3) of the Supplemental Rules For Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, and the Bankruptcy Court's marshalling of assets. Hellenic's past and present applications for the use of cash collateral to cover operating expenses squarely raise this conflict to the extent Hellenic seeks permission to spend freight revenue properly administered in admiralty.

The difficulty of the issues presented by the jurisdictional dispute will be apparent from the discussion to follow. The case law is sparse and conflicting. It would be preferable to have more time to reflect on these important issues and to entertain additional submissions and argument by learned counsel, but time is in short supply since Hellenic has only 120 days from December 12, 1983, the date of the petition to present a plan of reorganization. Initiation of the resolution of this jurisdictional dispute by a district court decision seems imperative, particularly since some, and perhaps all, of the same funds may be the subject of motions in this court and the Bankruptcy Court.

What follows is this court's effort to achieve the symbiosis that in Judge Adams' view escaped the Third Circuit in *In re Central Railroad Company of New Jersey*, 469 F.2d 857 (3d Cir.1972), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973)[5] where a similar conflict was presented. In his words:

> Our task then, as so often the case with the judiciary, is to reconcile two concepts, in order to permit each to serve its purpose.

*Id.* at 867 (dissent). The court recognizes that uncertainty may result from the resolution reached here, but, as Judge Adams stated:

> [c]ertainty in such matters may well be an illusion. The complexities facing the judiciary in the dynamic world of court-supervised reorganization cannot be solved by unreal simplicities of law.

*Id.* at 871 n. 12.

### 2. The effect of Marathon

ITO, CTI and ICS challenge the authority of the Bankruptcy Court to determine the validity and priority of maritime liens after *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held unconstitutional Congress' broad grant of jurisdiction to the Bankruptcy Courts. They presumably either would have this court leave the nonadmiralty matters to the Bankruptcy Court and retain jurisdiction here to determine the admiralty claims or would have this court consider both admiralty and nonadmiralty matters. Morgan Guaranty suggests that this court should

5. Ironically perhaps, this opinion adopts the approach of Judge Adams but not the same result.

withdraw the bankruptcy matters that have been referred to Judge Lifland, pursuant to Emergency Bankruptcy Rule I of the Southern District of New York (the "Emergency Rule"), and decide them along with the admiralty claims. Hellenic concedes the authority of this court to sit as the reorganization court and to consider all remaining matters and recommends that, to the extent a jurisdictional conflict exists, Judge Lifland be appointed a Special Master in admiralty.

Were this court to withdraw all aspects of the bankruptcy petition from the Bankruptcy Court, it would obviously avoid any possible conflict with *Marathon*. Whatever it said about the jurisdiction of the Bankruptcy Courts, "*Marathon* in no way involved the jurisdiction of the district courts." *In re Kaiser*, slip op. at 226 (2d Cir. November 18, 1983). Under Emergency Rule (c)(2), "The reference to a bankruptcy judge may be withdrawn by the district court at any time on its own motion or on timely motion by a party." In addition, "if a reference is withdrawn, the district court may retain the entire matter . . . ."

Continued referral of all remaining matters to the Bankruptcy Court, by contrast, would raise the possibility of a conflict with *Marathon*. ITO, CTI and ICS contend that a referral of admiralty claims to the Bankruptcy Court would indeed violate *Marathon*. However, the cases that have interpreted *Marathon* indicate that such a referral would not be unconstitutional.

The Emergency Rule, adopted by this Court and the District Court for the Eastern District of New York, automatically refers "[a]ll cases under Title 11 and all civil proceedings arising under Title 11 or arising in and related to cases under Title 11" to the Bankruptcy Court. This Circuit has held the Emergency Rule constitutional. *In re Kaiser, supra,* slip op. at 235. Several other courts have held similar rules constitutional. *See, e.g., White Motor Corp. v. Citibank, N.A.,* 704 F.2d 254, 261–64 (6th Cir.1983); *In re Braniff Airways,* 700 F.2d 214, 215 (5th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983); *In re Hansen,* 702 F.2d 728, 729 (8th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983). A referral of both admiralty and nonadmiralty matters to the Bankruptcy Court would thus be permissible under the Emergency Rule and constitutional under *Marathon.*

The Emergency Rule leaves the decision within this court's discretion. *See* Emergency Rule (c)(2). In making this decision, I note that there are strong reasons for leaving the Bankruptcy Court with those matters over which it can exercise jurisdiction. As this Circuit has noted, reference of bankruptcy matters to Bankruptcy Courts leaves district courts "free to attend to the other matters on their crowded calendars, giving all litigants a better opportunity to have their day in court." Bankruptcy judges, the Second Circuit noted, have "expertise in bankruptcy law. There is no assurance that a better initial determination would be made by a district court." *In re Kaiser, supra,* slip op. at 234–35. As was noted above, the automatic stay has been lifted with respect to the four ships under arrest in this jurisdiction. Bankruptcy issues predominate the remainder of this matter. As a result, the *In re Kaiser* reasoning suggests the desirability of leaving this matter to the expertise of the Bankruptcy Court.

Further, of course, either I, sitting as both the Bankruptcy Court and Admiralty Court, or Judge Lifland, sitting as a Special Master in admiralty by my designation and the Bankruptcy Judge, will be faced with the same jurisdictional and procedural conflict. There is no reason to believe that the problem diminishes by the ability to wear two hats, instead of one. For these reasons, I decline on the basis of the record to date to withdraw the bankruptcy proceedings from the Bankruptcy Court.

### 3. The power of the Bankruptcy Court to determine validity and priority of maritime liens

The threshold question is whether the admiralty court's jurisdiction is exclusive with respect to the adjudication and enforcement of maritime liens. Article III § 2 of the Constitution provides that "[t]he

judicial Power shall extend ... to all Cases of admiralty and maritime Jurisdiction," and 28 U.S.C. § 1333(1) grants original admiralty or maritime jurisdiction to the district courts. Relying on an old line of cases which gave admiralty courts exclusive jurisdiction over maritime liens, *Moran v. Sturges,* 154 U.S. 256, 14 S.Ct. 1019, 38 L.Ed. 981 (1894), *Hudson v. New York & Albany Transportation Co.,* 180 F. 973 (2d Cir.1910), an early case held that a subsequent bankruptcy proceeding could not take precedence over an existing *in rem* admiralty action. *The Philomena,* 200 F. 859 (D.Mass.1911). In *The Philomena,* the admiralty court refused to relinquish its jurisdiction in the face of liquidation proceedings by the shipowner, concluding:

> [I]t is settled that the admiralty courts have exclusive jurisdiction over maritime liens, and that as other courts are without power to establish and enforce such liens, so they are without power to displace them.... The admiralty court, ...., cannot refuse to proceed, in an admiralty suit properly before it, wherein its jurisdiction over the property was complete before the bankruptcy proceedings were inaugurated, nor can it require the libellant, in order to get his lien established, to present and prosecute his claim in proceedings which though also before it, are not proceedings wherein admiralty jurisdiction can be exercised.

*Id.* at 861 (citations omitted), *see also In re Martin,* 78 F.Supp. 433 (E.D.N.Y.1948) (district court retained jurisdiction when *in rem* seizure of vessel preceded filing of petition for reorganization). *See* discussion in Landers, The Shipowner Becomes a Bankrupt, *supra,* at 497–507.

Subsequent cases, notably *The Robert & Edwin,* 32 F.2d 390 (D.Mass.1929), recognized that Bankruptcy Courts have the power to adjudicate maritime liens.[6] *See also In re Waldeck-Deal Dredging Co.,* 45 F.2d 951 (4th Cir.1930); *West Kentucky Coal Co. v. Dillman,* 15 F.2d 25 (8th Cir. 1926); *Defense Plant Corp. v. U.S. Barge Lines, Inc.,* 57 F.Supp. 14 (S.D.N.Y.), *aff'd* 145 F.2d 766 (2d Cir.1944); *In re Southern Pacific Golden Gate Ferries, Ltd.,* 1942 A.M.C. 1581 (N.D.Cal.1942); *The Transfer No. 18,* 17 F.Supp. 488 (D.Conn.1936). In *The Robert & Edwin,* a shipowner became a voluntary bankrupt, and the principal asset of the estate was a ship. The court noted: "The trustee in bankruptcy takes the schooner in the same plight and condition as she was held by the bankrupt, *i.e.,* subject to all valid maritime liens to be enforced with priorities according to the admiralty law." *Id.* at 390.

There seems little doubt today that the Bankruptcy Court can and will adjudicate the validity and priority of maritime liens asserted against Hellenic vessels and freights. As the Honorable Milton Pollack noted: "Although there is some question whether a bankruptcy court or an admiralty court is the proper forum, it is nevertheless clear that a valid maritime lien will be enforced against a ship which is the asset of a bankrupt shipowner (or one in reorganization)." *Empire Stevedoring Co. v. Oceanic Adjusters, Ltd.,* 315 F.Supp. 921, 925 (S.D.N.Y.1970); *see also Korrosion Kontrollers, Inc. v. Devaney,* 1980 A.M.C. 82 (S.D.N.Y.1979) (absent laches, a maritime lien, transferred as a result of a judicial sale from a vessel to a fund, must be given validity in a bankruptcy proceeding);

---

**6.** It is interesting to note, however, that a relatively recent case held that a reorganization court lacked jurisdiction to order distribution of a fund in the registry of an admiralty court in a limitation of liability proceeding under the Limitation of Liability Act, 46 U.S.C. §§ 181–89. *In re Central R.R. Co. of New Jersey,* 469 F.2d 857 (3d Cir.1972), *cert. denied,* 411 U.S. 938, [93 S.Ct. 1900, 36 L.Ed.2d 399] (1973). The majority relied on the "exclusive jurisdiction" of the admiralty court in limitation proceedings where there are multiple claims and the claims exceed the fund. *Id.* at 861–63. Judge Adams dissent-

ed, arguing that it was possible to harmonize the apparent conflict between the Limitation of Liability Act and the Bankruptcy Act, and he concluded that the reorganization court was the appropriate forum because the Congressional purpose in granting extensive jurisdiction to the admiralty court—to encourage shipbuilding and to protect the shipowner—was not served by requiring the admiralty court to resolve a controversy among claimants when one of the claimants was in reorganization. The majority's holding is criticized in G. Gilmore & C. Black, *supra,* at § 10–19a.

*In re The Queen, Ltd.*, 1973 A.M.C. 646 (E.D.Pa.1973) (bankruptcy referee recognized maritime lien status of suppliers of "necessaries" to vessel); G. Gilmore & C. Black, *supra*, § 9–93.

### 4. The effect of custodia legis

■ ITO, CTI and ICS contend that the doctrine of custodia legis compels the conclusion that this court has exclusive jurisdiction over the arrested vessels, their freights and the freights arrested by ITO. The doctrine of custodia legis is based upon principles of comity and is a practical means of resolving a jurisdictional dispute between two courts with concurrent jurisdiction over a single *res*. Under the doctrine of custodia legis, the court that first secures custody of the property administers the property. *See, e.g., Ciel y Cia S.A. v. Nereide Societa di Navigazione per Azioni*, 1983 A.M.C. 1192, 1194 (E.D. Va.1983); *Belcher Co. of Alabama, Inc. v. M.V. MARATHA MARINER*, 1983 A.M.C. 2089 (S.D.Tex.1983).

For example, in *Wong Shing v. MV MARDINA TRADER*, 564 F.2d 1183 (5th Cir.1977), a vessel was arrested and seized in the Canal Zone pursuant to an action by crew members for wages. Shortly thereafter, the parent company of the owner of the vessel went into receivership. The trustee obtained a temporary restraining order from a federal district court in Illinois against the United States Marshal of the Canal Zone in an effort to postpone the sale of the vessel. The district court in the Canal Zone ordered the sale to proceed as scheduled and directed the Marshal to disregard the temporary restraining order. The Fifth Circuit upheld the district court's decision, stating:

> When a court of competent jurisdiction takes possession of property through its officers, that property is withdrawn from the jurisdiction of all other courts. Where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have attached, that right cannot be arrested or taken away by proceedings in another court. *Moran v. Sturges*, 154 U.S. 256, 14 S.Ct. 1019, 38 L.Ed. 981 (1894). The Illinois Court was without jurisdiction over the vessel whose sale it

sought to restrain. Exclusive jurisdiction rested in the Court in Panama once the ship had been arrested and admiralty proceedings instituted. The Court for the Canal Zone, in a valid exercise of its jurisdiction, chose to disregard the temporary restraining order and direct the Marshal to proceed with the sale.

*Id.* at 1188.

Hellenic contends that custodia legis is inapplicable because Hellenic has filed a petition for reorganization under Chapter 11 of the bankruptcy laws. Although ITO, CTI and ICS assert that Hellenic is, in fact, proceeding with a liquidation rather than a reorganization because most if not all of the ships in Hellenic's fleet are under arrest and subject to foreclosure, this court must assume at this juncture that Hellenic is in good faith attempting a reorganization. The 120-day period in which Hellenic must submit a plan of reorganization has not yet expired. At the same time, it is appropriate to note that this period can be extended or shortened for good cause shown, a cause which might well be established by virtue of the uncertainty generated by the instant motions.

Prior to the enactment of the new Bankruptcy Code in 1978, a number of courts considered the question of whether the doctrine of custodia legis applied to pending *in rem* admiralty proceedings when the debtor commenced reorganization proceedings, as opposed to liquidation proceedings. The courts reached conflicting results. *Compare In re Martin*, 782 F.Supp. 433 (E.D. N.Y.1948) (district court retained jurisdiction when *in rem* seizure of vessel preceded filing of petition for reorganization), *with Atlantic Richfield Co. v. Good Hope Refineries, Inc.*, 604 F.2d 865, 869 (5th Cir.1979) and *In re J.S. Gissel & Co.*, 238 F.Supp. 130 (S.D.Tex.1965).

Two cases subsequent to the enactment of the new Bankruptcy Code, *McDermott, Inc. v. M.V. ANGELA BRILEY*, No. S 83–0434 (N), slip op. (S.D.Miss. Jan. 13, 1984); *Ciel y Cia, supra*, at 1194–95, permitted a pending *in rem* admiralty proceeding to go forward despite a subsequent

reorganization proceeding instituted by the debtor. However, the underlying principles do not change with the passage of the new Bankruptcy Code, and this court will give equal weight to those cases decided before the new Code.

Two leading commentators agree that custodia legis is the appropriate rule in the absence of a reorganization proceeding. Professor Landers notes:

> If admiralty jurisdiction is based on an in rem action, it is painfully simple to tell whether a vessel will be administered in admiralty or bankruptcy. The first court to obtain jurisdiction over the asset administers it. Thus, if the marshal, pursuant to admiralty process, has attached the vessel first, the admiralty court administers the asset. If the bankruptcy petition is filed before the marshal reaches the vessel, the bankruptcy court administers the asset.

Landers, The Shipowner Becomes a Bankrupt, 39 U.Chi.L.Rev. 490, 493–94 (1972). Landers goes on to state, however, that in a reorganization the prior custody of admiralty is irrelevant, explaining that the dominance of the Bankruptcy Court in reorganization is necessary because the goal of reorganization—continuation of the debtor's business—requires the supervision of a single court. In contrast, when a liquidation is contemplated, the principle of comity permits the court that first obtained jurisdiction over an asset to supervise its liquidation. *Id.* at 509. Professor Landers concludes that the Bankruptcy Court must have the power to restrain maritime creditors and nonbankruptcy courts from interfering with a reorganization. *Id. See also* G. Gilmore & C. Black *supra*, § 9–92, at 807–08 ("The powers of a reorganization court to restrain proceedings already instituted when the petition is filed are more extensive than those of a bankruptcy court.")

In the absence of the competing concerns of a reorganization proceeding, custodia legis provides a simple, practical resolution of a jurisdictional dispute between courts of concurrent jurisdiction. Given the rehabilitative goal of a reorganization proceeding, however, I conclude that

custodia legis does not necessarily control the present situation. This result contradicts the recent decisions in *Ciel y Cia, supra,* and *McDermott, Inc. v. MV ANGELA BRILEY, supra,* but *Ciel y Cia* involved an ancillary petition arising out of bankruptcy proceedings pending in Italy, and the petition was filed under 11 U.S.C. § 304 so that the automatic stay of § 362 was not applicable. Moreover, in discussing custodia legis, the court in *Ciel y Cia* relied on the discussion in Landers, The Shipowner Becomes a Bankrupt, *supra* and G. Gilmore & C. Black, *supra,* regarding bankruptcy proceedings other than reorganization. The Court then went on to hold, in the alternative, that the bankruptcy court was without jurisdiction after *Marathon. McDermott* apparently involved facts very similar to those in the instant case, but the two-page opinion by the magistrate relies completely on *Ciel y Cia* without any independent analysis. As noted above, I find *Ciel y Cia* distinguishable. Custodia legis does not always control.

### 5. Competing policies of admiralty and bankruptcy

Because the freights attached by ITO appear to be properly within the jurisdiction of both courts, the first question is whether the automatic stay provision of the Bankruptcy Code applies to a pending *in rem* admiralty action.

Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), provides:

> (a) Except as provided in subsection (b) of this section, a petition filed under § 301, 302 or 303 of this title ... operates as a stay applicable to all entities, of—
>
> (1) the commencement or continuation, including the issuance or employment of process; of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the

commencement of the case under that title;

\* \* · \* \* \* \*

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title.

 The stay is effective upon the date of the filing of the petition and formal service is not required. *In re Miller*, 22 B.R. 479 (D.C.Md.1982); *In re Eisenberg*, 7 B.R. 683 (Bkrtcy.E.D.N.Y.1980); *see, generally, 2 Collier on Bankruptcy*, § 362.03, 362.26 (15th ed. 1979). Those who seek to avoid the proscription of § 362 must apply to the court for an order to lift, vacate or modify the automatic stay for good cause shown. 11 U.S.C. § 362(d). *See In re Johns-Manville Corp.*, 26 B.R. 919 (Bkrtcy. S.D.N.Y.1983).

 It is relatively well-settled that the Bankruptcy Court may enjoin admiralty proceedings *in rem* subsequently brought against a ship that is part of the bankruptcy estate. *E.g., Atlantic Richfield Co. v. Good Hope Refineries, Inc.*, 604 F.2d 865, 869 (5th Cir.1979); *Farmers & Traders State Bank of Meredosia v. Magill*, 545 F.2d 583, 586–87 (7th Cir.1976), *cert. denied*, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977); *Texas Co. v. Hauptman*, 91 F.2d 449, 451 (9th Cir.1937); *West Kentucky Coal Co., supra*, at 26; *Defense Plant Corp., supra*, at 15; *see also* G. Gilmore & C. *Black, supra*, § 9–92, at 807.

 In general, a subsequent bankruptcy proceeding does not deprive the admiralty court of jurisdiction over a previously commenced maritime *in rem* action. 7A Moore's Federal Practice 645 (1983–84 Supp.) (citing *Atlantic Richfield, supra*). "If the subsequent bankruptcy proceeding is for a Chapter X reorganization or a Chapter XI arrangement, however, prior in rem proceedings may be stayed." *Id. See also* Landers, The Shipowner Becomes a Bankrupt, *supra*, at 509.

 I choose to resolve the questions raised by these motions by reviewing the policies which underly the competing jurisdictions. As Hellenic so forcefully argues, citing *Susquehanna Chem. Corp. v. Producers Bank & Trust Co.*, 174 F.2d 783, 787 (3d Cir.1949), "The purpose of reorganization is to save a sick business, not to bury it and divide up its belongings." On the other hand, the unique and transient nature of admiralty claims requires that creditors be allowed to pursue their claims wherever they may find and attach the debtor's ship, *Ciel y Cia. v. Nereide Societa di Navigazione per Azioni*, 1983 A.M.C. 1192, 1197 (E.D.Va.1983); and, as all parties to these proceedings concede, only an admiralty court can give a title to the ship which will achieve worldwide recognition.

These competing policies and priorities were considered in *In re J.S. Gissel & Co.*, 238 F.Supp. 130 (S.D.Tex.1965). In that case, libels *in rem* and *in personam* were filed to foreclose a preferred ship mortgage. Less than three weeks later, the mortgagor filed a petition for reorganization. The reorganization court stayed the foreclosure action, noting the distinction between ordinary bankruptcy and proceedings for reorganization. The court stated: "A plan of reorganization may affect and modify all of the debtor's debts, both secured and unsecured. Consequently the power to control the actions of secured creditors and proceedings to enforce their claims, as well as all other claimants, is a prerequisite to a successful administration of the proceeding." *Id.* at 133. The *Gissel* court attempted to distinguish *In re Martin, supra*, but with little success. Nonetheless, the Fifth Circuit adopted *Gissel* as the better view in *Atlantic Richfield Co. v. Good Hope Refineries, Inc.*, 604 F.2d 865, 869 (5th Cir.1979), although, in that case, the court went on to decide that a bond posted by a surety to secure the release of the vessel did not have to be administered by the Bankruptcy Court, noting carefully the distinction that the bond was not the bankrupt's property.

The importance of the distinction between reorganization and liquidation pro-

ceedings is further supported by the Supreme Court's decision in *United States v. Whiting Pools, Inc.*, — U.S. ——, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), which according to Hellenic has terminated the *in custodia legis* doctrine. There the Internal Revenue Service ("IRS") seized tangible personal property of Whiting pursuant to Section 6321 of the Internal Revenue Code of 1954, 26 U.S.C. § 6321, and, the following day, Whiting filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The Supreme Court concluded that the reorganization estate includes property of the debtor seized by a creditor prior to the filing of a reorganization petition. The Court distinguished *Phelps v. United States*, 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975) which held that under the prior Bankruptcy Act a Bankruptcy Court lacked jurisdiction to direct the IRS to turn over property that was in the possession of an assignee of the debtor's creditors on two grounds: First, the new Bankruptcy Code abolished the distinction between summary and pleanary jurisdiction, thus extending the jurisdiction of Bankruptcy Courts to property in which the debtor does not hold a possessory interest. Second, *Phelps* involved a liquidation and therefore did not apply to reorganization proceedings. *Id.* at 2314 n. 13.

Of course, the arrest by ITO of the freights is akin to the seizure by the IRS of personal property of Whiting pursuant to the levy and distraint provision of the Internal Revenue Code, 26 U.S.C. § 6321. The Supreme Court in *Whiting* balanced the interests of the IRS as a secured creditor and the congressional goal of encouraging reorganizations. Noting that Congress chose not to exclude property from the estate for the protection of secured creditors, but rather to provide "adequate protection" for their interests, 11 U.S.C. § 363(e), the court concluded that the secured creditor had to look to that provision for protection. Id. at 2314–15. While the *Whiting* decision dealt with tangible property of the debtor, it would seem reasonable for the same reasoning to apply to intangible property, such as accounts receivable, *see* Bankruptcy Commentary, 49

Brooklyn L.Rev. 741, 749 (1983) (commenting on the Second Circuit decision in *Whiting* ), and freights.

The freights arrested by ITO which were earned by vessels other than the INNOVATOR, IDEAL, STAR and SPIRIT should be controlled by this rule. There is no competing admiralty concern—i.e. sale of a vessel free and clear of all liens—which would counsel a different result. As the *Whiting* Court noted: "[B]ankruptcy law ... modifies the procedural rights available to creditors to protect and satisfy their liens." *Id.* at 2314 (footnote omitted). Although ITO's claims are distinctly maritime, the Bankruptcy Court may determine the validity and priority of maritime liens. *See e.g., Empire Stevedoring Co., supra,* at 315; The *Robert & Edwin, supra,* at 390. The Bankruptcy Court has required Hellenic to grant ITO and other lien claimants a security interest in substitute collateral that is said to have a residual value of at least $420,000. If this is not "adequate protection," ITO can appeal the Bankruptcy Court's decision on that ground.

■ It appears to this court that the character of the asset should be a significant factor in the decision as to which court should administer it. The admiralty court is particularly well equipped to administer the execution of maritime liens against the vessels. Only an admiralty court can without question deliver a vessel free and clear of all liens. Hence *in custodia legis* will be applied to the assets thus controlled. It is unclear that a foreign jurisdiction would recognize the sale of a vessel by the Bankruptcy Court. *See* G. Gilmore & C. Black, *supra,* § 9–95 at 811. Judge Lifland's order filed January 20, 1984 vacating the stay on consent is a de facto recognition by the parties of the primacy of the admiralty court with respect to certain assets of Hellenic, such as vessels and those assets which are part of the vessels, that are peculiarly maritime in nature. The freights seized by ITO, on the other hand, are essentially accounts receivable. There is no reason for this court rather than the Bankruptcy Court to decide the claims

against them. Moreover, in view of the related case rule, this court presumably will review any appeal of a decision of the Bankruptcy Court as to the validity and priority of maritime liens and the adequacy of the protection offered to the maritime lienors.

It has to be conceded that this effort to reconcile these conflicting concepts may be illusory and the line between primarily admiralty and bankruptcy jurisdiction too difficult to define, despite this attempt to do so. Indeed, it has been argued here, and may later be demonstrated, that to employ admiralty procedures and jurisdiction at all is to deny a shipping line the capacity to reorganize. It may be that sufficient grounds, subsequent events or clearer vision may require modification of the views here set forth in accordance with the customary rules for such modification and that all proceedings should be before one court whether delineated admiralty or bankruptcy.[7] While such an application is not invited, no surprise would result from its making.

Accordingly, I will deny the relief sought by ITO with respect to the freights other than those attributable to the INNOVATOR, IDEAL, STAR and SPIRIT and grant the relief sought by CTI and ICS.

Submit order on notice.

IT IS SO ORDERED.

---

7. Counsel have eloquently urged that they be spared the trip from the Bankruptcy Court on the second floor to the Admiralty Court on the third floor. At the moment I have the view that the exercise is useful for the reasons stated.

Should a substantial, as opposed to theoretical, impediment to proceeding in either court develop, the alternatives earlier mentioned will be explored.